## Lloyd, Appellant, *v.* Kelly.

Argued October 27, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*William L. Hicks,* with him *John W. Newlin,* for appellant.

*John J. Haberstroh,* with him *Scheeline, Smith & Leopold,* for appellee.

OPINION BY CUNNINGHAM, J., January 27, 1938:

When this case came on for trial in the court below the pleadings, consisting of an amended statement of claim and an amended affidavit of defense which included new matter in the nature of a set-off and counterclaim, presented a rather complicated situation. At the conclusion of the testimony, however, the only matter actually in controversy was whether the plaintiff was entitled to appropriate to his own use (as a for-

feiture for the alleged breach by the defendant of certain contracts) the sum of $3,531.50, deposited with him by the defendant, or whether the defendant was entitled to take credit for this amount in the settlement of their mutual accounts. That issue arose out of the following circumstances.

J. R. Lloyd, the plaintiff, is a wholesale dealer at Pittsburgh in butter, eggs, cheese and "cold packed, selected, fruits and berries," and Herbert W. Kelly, the defendant, is a retail dealer having his place of business in Altoona where he owns, or at least controls, a cold storage warehouse.

Lloyd had for sale and distribution, inter alia, a certain brand of cold packed fruits and berries known as the "Jarel Brand,"— a trade name owned by him. In January, 1930, the parties entered into negotiations looking toward the sale by defendant in Altoona and vicinity of that brand of fruits and berries. These negotiations resulted in the execution on January 28, 1930, of a contract, which may be considered as a "franchise," granting to defendant the exclusive right to sell Jarel Brand fruits at retail in the designated territory. In this agreement, the term of which was two years from May 1, 1930, the plaintiff was designated as the seller and the defendant as the buyer. One of its provisions was that a supply of fruits and berries should be placed by the seller in the cold storage warehouse at Altoona, but it was provided that "all merchandise in warehouse or cold storage shall remain the property of seller, to be released to buyer as required." Another provision of the contract was to the effect that the defendant would not sell any other brand of cold packed fruits or berries in the territory.

At the time the agreement was executed the fruits and berries had not yet been grown and as market prices would necessarily depend upon the extent of the crop and other circumstances it was impracticable to fix the prices to be paid by defendant to plaintiff for the goods

34

to be withdrawn by defendant from time to time from storage. The provision of the agreement with respect to prices therefore read: "All prices charged buyer for purchases made during the term of this contract shall be agreeable to the mutual satisfaction of both buyer and seller."

In this connection it may be noted that the defendant pleaded and testified that one of the inducements to him for entering into the contract was that plaintiff represented, in the course of the negotiations preliminary to its execution, that the prices to be charged defendant would "not exceed one cent per pound more than the price which plaintiff would pay to the canners and producers." Defendant further contended that this oral representation with respect to the maximum prices to be charged for the merchandise as withdrawn was fraudulently omitted from the written agreement. The agreement contained the following provisions relative to the method and time of payment by defendant:

"That buyer shall pay net cash, by weekly settlements for all merchandise withdrawn from warehouse, or cold storage, and to pay all storage charges from the time the merchandise is packed, whether charged for storage in the packers' cold storage or in Altoona cold storage.

"Buyer further agrees to pay to seller, upon acceptance of orders by seller, the sum of one dollar ($1.00) per can on all purchases of Jarel Brand cold packed selected fruits and berries made during the term of this contract, and credit in the same amount shall be taken by buyer upon settlement with seller as herein provided."

The method of transacting the business contemplated by the franchise agreement is illustrated by the first order given and accepted, under date of March 7, 1930, for the withdrawal of a portion of the merchandise in storage. The material portions of that order appear in a footnote.

Seven additional orders of the same general type for various quantities of merchandise were given by the de-

fendant to the plaintiff, the last of which was dated May 27, 1930. During the course of these transactions the requirement that defendant should deposit with plaintiff a fixed amount for each can was reduced from $1.00 to 50 cents per can. It was under this provision of the original agreement, and of each of the eight subsequent orders, that defendant deposited with plaintiff the aggregate sum of $3,531.50, above referred to; no terms of payment different from those specified in the agreement and orders were designated at any time by plaintiff's credit department.

Defendant contended, and introduced some evidence in support thereof, that the prices fixed by plaintiff in the orders were not in accordance with his promise that those prices would not exceed one cent per pound over the cost of the merchandise to plaintiff, in that in a number of instances he had been charged higher prices.

In view of the fact that at the trial defendant expressly admitted that by March 14, 1931, he had withdrawn from storage and disposed of to his customers, merchandise of the value of $3,411.16, to which his deposits had not then been applied, it seems to us that his contentions,

---

"Seller: J. R. Lloyd Company

Buyer: The Gutwald-Kelly Company, Altoona, Pa.

Buys the following, subject to prices, terms, quantities, deliveries and conditions stated below:

*Quantity and Kind of Merchandise:* 1200 Cherries, 500 Straws, 200 B. Rasp., 50 R. Rasp., 300 Huckleberries. ......

*Price:* Cherries 13c [per pound], Straws 15½c, B. Rasp. 15¼c, Red Rasp. 16c, Huckleberries 14½c. ......

Terms of payments shall be designated by seller's credit department at time of delivery.

Buyer shall deposit with seller $1.00 per can on the signing hereof same to be held by seller and applied on account due on last delivery. ......

It is agreed that all goods remaining at the end of May 1, 1931, are to be billed and shipped or sold for buyer's account at seller's option. ......."

with respect to the oral representations alleged to have been made by the plaintiff and their violation, became collateral issues having no material bearing upon the merits of the controversy existing between the parties at the conclusion of the evidence.

Difficulties arose between the parties in March, 1931. They had their inception in the fact that the plaintiff requested the defendant to execute a bond to the New York Indemnity Company indemnifying that company from any loss incurred by it through having assumed responsibility for financial transactions between plaintiff and certain banks.

Under date of March 13, 1931, defendant wrote plaintiff: "Gentlemen: This will acknowledge receipt of yours of March 11. We are returning herewith indemnity bond as it is not a part of our arrangement. We are down to less than one hundred cans of cherries in stock and if you care to place car of cherries here to take care of our requirements kindly advise us promptly."

Plaintiff's reply to this letter was a telegram dated the following day and reading: "Letter received. *Take no deliveries from our merchandise* stored with you until your account with us is brought up to within the terms which is part of our agreement with you. We will *notify you from this office* when deliveries can be resumed. Please adhere strictly to this order." (Italics supplied)

By that date defendant had an unapplied deposit with plaintiff of $3,531.50 and the value of the unpaid for merchandise which defendant had withdrawn was only $3,411.16. Plaintiff never notified defendant that he would accept further orders from him.

Under the same date plaintiff wrote defendant a letter from which we quote: "We were sadly disappointed when you did not accommodate us by filling out the bond application which would have given us some relief in these hard times when cash is short. ...... I hope you will reconsider it, for I am afraid at this time we cannot place a full car of cherries with you and will have to supply

you with Pittsburgh stock, and you may as well be collecting storage, as the plant will have to run just the same, and a carload stocked there would be more convenient for you. However, enclosed you will find a statement for $1,424.63 and as we need the money very badly at this end we must have a substantial check. We would appreciate very much if you would pay even bills instead of on account. Mail us a check not later than Monday." This demand was not complied with by defendant and the business relations of the parties then terminated.

Plaintiff's statement of claim contained two items: First, the above mentioned "balance due on open account, $3,411.16," and second, an item of $15,608.15, as damages alleged to have been suffered by plaintiff through the failure of defendant to take all the fruits and berries procured by plaintiff from canners and producers to supply the needs of defendant in accordance with the terms of the original contract, it being further averred by plaintiff that the current market prices of such merchandise, remaining on his hands on May 1, 1931, had become less than the prices defendant had agreed to pay. From this item of $15,608.15 plaintiff deducted the above mentioned sum of $3,531.50, admittedly deposited by defendant with plaintiff in accordance with the provision of the contracts, thereby making his net claim for damages $12,076.65. This item for alleged damages was abandoned by counsel for plaintiff during the course of the trial and the entire controversy settled down to the question whether plaintiff was entitled to appropriate the deposit, as damages for defendant's alleged breach of the contract, or whether defendant was entitled to have the deposit applied first to the payment of his admitted indebtedness of $3,411.16, and the surplus of $120.34 returned to him in satisfaction of his counterclaim.

The disposition of these opposing contentions depends primarily upon ascertaining which of the parties breached the contracts. In the absence of proof of a

breach by defendant no ground existed for a forfeiture of his deposit. The learned trial judge, PATTERSON, P. J., submitted the question of responsibility for the termination of the contract, during its term, to the jury as a matter of fact to be determined by it. He charged that if that responsibility rested with the defendant a verdict should be rendered in favor of the plaintiff for $3,411.16, but if the plaintiff, without any failure upon the part of the defendant to comply with its terms, refused to continue deliveries under the contract the verdict should be in favor of the defendant in the sum of $120.34 upon his counter-claim. The jury rendered a verdict for the defendant in the latter amount. The court below denied plaintiff's motions for judgment in his favor n. o. v., or a new trial.

Upon this appeal by plaintiff from the judgment entered upon the verdict, his counsel do not complain of the manner in which the case was submitted to the jury; their contention is there was nothing to submit, but the court should have determined as a matter of law through an interpretation of the telegram and letter from plaintiff to defendant whether these communications "constituted a cancellation of the contract between the parties." In effect, they argue that their point for binding instructions should have been affirmed because, as they assert, they "are unable to find anything in either of them which indicated any desire or intention upon the part of the plaintiff to cancel the contract."

We are unable to agree with their contention. There were no ambiguities in the contracts or in the correspondence. The intention of the plaintiff was a matter of fact to be inferred not from his communications alone but also from his acts, which were, perhaps, more significant than his words.

Plaintiff's demand upon defendant for an indemnifying bond was entirely unwarranted by anything in the original contract or in the orders given and accepted thereunder. The defendant was fully justified in re-

turning the bond unexecuted for the reason stated by him—"it is not a part of our arrangement."

Under all the evidence a jury could reasonably find that plaintiff intended by his telegram and letter to give defendant peremptory notice that no more "deliveries" of Jarel Brand merchandise would be authorized until defendant should "reconsider" his refusal to give plaintiff financial "relief" in matters in which defendant was not concerned, and until defendant sent plaintiff his "check" for merchandise more than covered by defendant's deposit.

There was no evidence that defendant had defaulted in any of his contractual obligations to plaintiff. Even if he had, it would not follow that plaintiff could appropriate defendant's entire deposit. There was no provision in any of the contracts that defendant's deposits should, upon any breach by him, be retained by plaintiff as liquidated damages. Nothing more than actual damages could have been recovered in any event, and, as already stated, there was no proof of such damages.

The express provision of the original contract with respect to these deposits was that they should be paid to the seller (plaintiff) and "credit in the same amount shall be taken by buyer (defendant) upon settlement with seller." Each of the eight orders contained this language: "Buyer shall deposit with seller $1.00 (later 50 cts.) per can on the signing hereof, same to be held by seller and applied on account due on last delivery."

Accepting plaintiff's own figures, the application of defendant's deposits to the "accounts" due upon all "deliveries" made prior to plaintiff's telegram warning defendant to take no further deliveries left plaintiff indebted to defendant in the amount of the judgment appealed from.

Judgment affirmed.